# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| LEE E. RUSHING SMITH, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. CIV-15-396-SPS |
| | ) |
| NANCY A. BERRYHILL, | ) |
| Acting Commissioner of the Social | ) |
| Security Administration,[1] | ) |
| | ) |
| Defendant. | ) |

## OPINION AND ORDER

The claimant Lee E. Rushing Smith requests judicial review of a denial of benefits by the Commissioner of the Social Security Administration pursuant to 42 U.S.C. § 405(g). He appeals the Commissioner's decision and asserts the Administrative Law Judge ("ALJ") erred in determining he was not disabled. For the reasons set forth below, the Commissioner's decision is hereby REVERSED and the case REMANDED to the ALJ for further proceedings.

### Social Security Law and Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment[.]" 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Social Security Act "only if his physical or mental impairment or impairments are of such

---

[1] On January 20, 2017, Nancy A. Berryhill became the Acting Commissioner of Social Security. In accordance with Fed. R. Civ. P. 25(d), Ms. Berryhill is substituted for Carolyn W. Colvin as the Defendant in this action.

severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]" *Id*. § 423 (d)(2)(A). Social security regulations implement a five-step sequential process to evaluate a disability claim. *See* 20 C.F.R. §§ 404.1520, 416.920.[2]

Section 405(g) limits the scope of judicial review of the Commissioner's decision to two inquiries: whether the decision was supported by substantial evidence and whether correct legal standards were applied. *See Hawkins v. Chater*, 113 F.3d 1162, 1164 (10th Cir. 1997). Substantial evidence is "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971), *quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938); *see also Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996). The Court may not reweigh the evidence or substitute its discretion for the Commissioner's. *See Casias v. Secretary of Health & Human Services*, 933 F.2d 799,

---

[2] Step one requires the claimant to establish that he is not engaged in substantial gainful activity. Step two requires the claimant to establish that he has a medically severe impairment (or combination of impairments) that significantly limits his ability to do basic work activities. If the claimant *is* engaged in substantial gainful activity, or his impairment *is not* medically severe, disability benefits are denied. If he *does* have a medically severe impairment, it is measured at step three against the listed impairments in 20 C.F.R. Part 404, Subpt. P, App. 1. If the claimant has a listed (or "medically equivalent") impairment, he is regarded as disabled and awarded benefits without further inquiry. Otherwise, the evaluation proceeds to step four, where the claimant must show that he lacks the residual functional capacity (RFC) to return to his past relevant work. At step five, the burden shifts to the Commissioner to show there is significant work in the national economy that the claimant *can* perform, given his age, education, work experience and RFC. Disability benefits are denied if the claimant can return to any of his past relevant work or if his RFC does not preclude alternative work. *See generally Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988).

800 (10th Cir. 1991). But the Court must review the record as a whole, and "[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951); *see also Casias*, 933 F.2d at 800-01.

## Claimant's Background

The claimant was born on October 26, 1964, and was forty-nine years old at the time of the administrative hearing (Tr. 44). He has a high school education and vocational training in welding, and has worked as a forklift driver and infantryman (Tr. 44-45, 70-71). The claimant alleges that he has been unable to work since August 11, 2009, due to posttraumatic stress disorder and peripheral neuropathy (Tr. 49, 267).

## Procedural History

The claimant applied for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-434, on March 30, 2012 (Tr. 233-34). The claimant's application was denied. ALJ Edward L. Thompson conducted an administrative hearing and found that the claimant was not disabled in a written decision dated March 17, 2014 (Tr. 19-34). The Appeals Council denied review, so the ALJ's decision represents the Commissioner's final decision for purposes of this appeal. *See* 20 C.F.R. §§ 404.981.

## Decision of the Administrative Law Judge

The ALJ made his decision at steps four and five of the sequential evaluation. He found that the claimant had the residual functional capacity ("RFC") to perform a limited range of medium work, *i. e.*, he could occasionally lift and/or carry (including upward pulling) fifty pounds; frequently lift and/or carry (including upward pulling) twenty-five

pounds; sit/stand/walk (with normal breaks) for a total of six hours each in an eight-hour workday; and occasionally reach overhead bilaterally, crawl, and climb ladders, ropes or scaffolds (Tr. 27-28). Additionally, the ALJ found the claimant could understand, remember, and carry out simple and some complex work tasks for a sustained period of time, at an appropriate pace, with only limited contact with the general public (Tr. 28). The ALJ concluded that the claimant was not disabled because he could return to his past relevant work as a forklift driver, and alternatively because there were other jobs in the national economy that he could perform, *i. e.*, hand packager, salvage laborer, housekeeping cleaner, extrusion press operator, and label coder (Tr. 32-34).

## Review

The claimant contends that the ALJ erred by failing to: (i) properly evaluate the opinion of consultative examiner Dr. Shalom Palacio-Holman, and (ii) account for his peripheral neuropathy in determining his RFC. The Court finds both contentions persuasive, and the decision of the Commissioner must therefore be reversed.

The ALJ found that the claimant had the severe impairments of peripheral neuropathy, lower extremities, mild to moderate, mixed sensory motor axonal degenerating in type, distal more than proximal; degenerative joint disease, bilateral shoulders; affective disorder; anxiety-related disorder; alcohol abuse; and a substance abuse disorder (Tr. 21). The record reveals the claimant was largely treated at the Jack C. Montgomery Veterans Affairs Medical Center ("VAMC") by nurse practitioner Vickie Holland for his physical impairments and by Drs. Trost, Ford, and Locke for his mental impairments (Tr. 336-644, 658-756).

On February 17, 2010, the claimant presented to Dr. Dennis Trost and reported nervousness, irritability, poor sleep, social isolation, panic attacks, and excessive alcohol consumption, all of which he stated began after he was discharged from active duty in August 2009 (Tr. 601-04). The claimant indicated his alcohol use was problematic and that he last drank eight days earlier (Tr. 602). Dr. Trost noted the claimant was pleasant, cooperative, alert, oriented, and coherent; made good eye contact; and had normal speech and thoughts, fair judgment, and a mildly constricted affect (Tr. 604). He diagnosed the claimant with panic disorder without agoraphobia, alcohol dependence, and insomnia probably related to alcohol withdrawal and/or obstructive sleep apnea, and began titrating antidepressant and antianxiety medications (Tr. 604). Dr. Trost also referred the claimant to an intensive outpatient substance use disorder program, which he participated in for the following eight weeks (Tr. 519-98). A discharge summary dated April 13, 2010, reflects that the claimant made good progress during the program, demonstrated insight into his behaviors and their consequences, and would benefit from aftercare and working (Tr. 520). At a follow-up appointment on April 14, 2010, the claimant's mood, irritability, sleep, and social isolation were improved (Tr. 517). Dr. Trost noted the claimant had no side effects from his medications, and was compliant with treatment (Tr. 517). The claimant later reported in March 2011 that he stopped taking his medications after two months of therapy, but he subsequently resumed mental health treatment in August 2012 (Tr. 488-96, 703-05). On September 6, 2012, Dr. William Ford noted the claimant's mood and anxiety were improved, but that he had decreased intellectual functioning, concentration, motivation, and insight as compared to his exam a

month earlier (Tr. 699). The claimant reported he was doing well with limiting his drinking, but his wife reported he was still drinking heavily (Tr. 698). Dr. Ford further noted the claimant was not open to doing anything about his drinking, concluded that he was "very much in denial" about his extremely serious drinking problem, and opined that it complicated his physical functioning (Tr. 699).

On July 7, 2011, Dr. Thomas Hoffman performed a mental status examination in connection with the claimant's compensation and pension examination (Tr. 477-86). Dr. Hoffman noted the claimant had tense psychomotor activity; spontaneous, but impoverished speech; an attentive, but suspicious and guarded attitude; a constricted affect; and an anxious mood (Tr. 480-81). He diagnosed the claimant with posttraumatic stress disorder ("PTSD") and alcohol abuse, and opined that the claimant's alcohol abuse had a negative impact on his social and occupational functioning (Tr. 485). Dr. Hoffman further opined that the claimant's PTSD reduced his reliability and productivity, but did not preclude gainful employment (Tr. 485-86).

Dr. Shalom Palacio-Holman performed a consultative mental status examination on June 8, 2012 (Tr. 646-49). She noted the claimant was relaxed and oriented with normal speech and a logical, goal-directed thought process (Tr. 647). The claimant's mood was normal, but his affect was flat (Tr. 647). Dr. Palacio-Holman indicated the claimant had average intelligence, an average fund of information, and demonstrated some ability for abstract thought (Tr. 647). She stated his attention, concentration, and memory were intact, and that he had good judgment, insight, and impulse control (Tr. 647). The claimant was able to interpret common proverbs, but could not discuss

leisure reading or current events (Tr. 647). Dr. Palacio opined that the claimant's overall ability to adjust to stress was poor, and that he would likely decompensate with continued stress based on his report of repeated episodes of decompensation (Tr. 648). She concluded that the claimant had psychological, cognitive, and emotional deficits that would significantly interfere with his ability to perform occupationally (Tr. 648). More specifically, she concluded that the claimant could not understand, remember, and carry out both simple and complex instructions within a work setting; could not adapt, persist, and keep pace within a work setting; and did not have the social ability to interact with the public, co-workers, and supervisors (Tr. 648).

On November 15, 2013, the claimant presented paperwork to Dr. Locke regarding a disability claim for his mental impairments (Tr. 742). Dr. Locke opined that the claimant's mental impairments were not disabling, and filled out the paperwork accordingly (Tr. 742). Dr. Locke recommended the claimant resume mental health care, but the claimant stated he could not do so due to work and distance (Tr. 742).

As to the claimant's physical impairments, he established care with nurse practitioner Vickie Holland on February 11, 2010 (Tr. 609-12). At this initial appointment, the claimant reported insomnia, cramps in his legs and shoulders, low back pain, and a history of numbness in his hands, hypertension, night sweats, depression, and alcohol abuse (Tr. 609, 613). Ms. Holland's physical exam was normal apart from the presence of a lipoma, bilateral breast enlargement, and an enlarged liver (Tr. 611). She provided the claimant with bilateral night wrist splints for his hand numbness and prescribed medication for hypertension and hypothyroidism (Tr. 612). She also strongly

advised the claimant to stop all alcohol consumption, and ordered an ultrasound of his liver, the results of which showed probable fatty infiltration of the liver (Tr. 369). At a follow-up appointment on March 2, 2010, the claimant reported the wrist splints relieved the numbness in his hands (Tr. 575). On July 18, 2011, the claimant reported numbness in his legs and cramping in his calves (Tr. 421-24). On examination, Ms. Holland noted the claimant's pulses and deep tendon reflexes were normal, but that he had muscle rigidity and loss of sensation between his ankles and knees (Tr. 421). She ordered an electromyography test, which revealed peripheral neuropathy in both legs (Tr. 419-420). Thereafter, Ms. Holland treated the claimant's pain with medication (Tr. 412-13, 417, 726, 746).

On June 23, 2012, Dr. Traci Carney performed a consultative physical examination (Tr. 651-57). Her exam of the claimant's legs revealed onychomycosis, but no point tenderness or swelling, adequate peripheral pulses, normal deep tendon reflexes, and no sensory or motor deficit (Tr. 653). Dr. Carney found the claimant had a safe, stable gait, did not ambulate with an assistive device, and had no identifiable muscle atrophy (Tr. 653). Her assessment included, *inter alia*, peripheral neuropathy, long term history of alcohol abuse, posttraumatic stress disorder, and anxiety (Tr. 653).

State reviewing psychologist Dr. Ron Cummings completed a Mental Residual Functional Capacity Assessment on July 12, 2012, and indicated that the claimant was moderately limited in his ability to understand, remember, and carryout detailed instructions and to interact with the general public (Tr. 95-97). Dr. Cummings concluded that the claimant could perform simple and some complex work tasks for a sustained

period of time and at an appropriate pace with only limited contact with the general public (Tr. 97). His findings were affirmed on review (Tr. 109-10).

State reviewing physician Dr. Kenneth Wainner completed a Physical Residual Functional Capacity Assessment on July 17, 2012, and indicated that the claimant could perform medium work with the postural limitations of occasional crawling and climbing ladders, ropes or scaffolds; and the manipulative limitation of occasional overhead reaching bilaterally (Tr. 324-31). His findings were affirmed on review (Tr. 107-09).

At the administrative hearing, the claimant testified that his neuropathy causes a daily, painful, needle-like sensation on the bottom of his feet (Tr. 49-50). He also testified that his hands cramp "just about every day" (Tr. 51). As to his legs, the claimant stated that he experiences swelling from his calves to his ankles which he relieves by elevating his feet for approximately an hour (Tr. 53-54). When asked if he had problems concentrating and staying on task, the claimant replied that he did, and that he would go back and forth to complete a task, but was not sure if he could follow a thirty minute television show (Tr. 58-59). Regarding his sleep, the claimant indicated he slept a total of six hours per day, but experiences nightmares and cramps in his legs (Tr. 59). The claimant further testified he is able to tolerate crowds only once in a while because he does not like people walking up behind him (Tr. 61). As to specific limitations, the claimant stated he could sit for forty-five minutes before needing to stand or lie down, stand for thirty to forty-five minutes, walk approximately one block, and lift up to ten pounds (Tr. 62-63).

In his written opinion, the ALJ discussed the claimant's hearing testimony and the Third Party Function Report prepared by the claimant's wife, and summarized the medical evidence. The ALJ gave the Dr. Palacio-Holman's opinions "little weight," finding they were wholly inconsistent with the body of her report (Tr. 30). He then gave "great weight" to state agency reviewing opinions, finding Dr. Pearce's opinion was consistent with the claimant's treatment history and Dr. Cummings' opinion, and finding Dr. Wainner's opinion and Dr. Bailey's opinion were consistent with the claimant's treatment history and Dr. Carney's consultative exam (Tr. 30). The ALJ included a limitation for the claimant's shoulders in his RFC despite the VA's conclusion that he had no shoulder limitations (Tr. 30).

The claimant first argues that the ALJ erred in rejecting the opinions of consultative examiner Dr. Palacio-Holman. "An ALJ must evaluate every medical opinion in the record, although the weight given each opinion will vary according to the relationship between the disability claimant and the medical professional. . . . An ALJ must also consider a series of specific factors in determining what weight to give any medical opinion." *Hamlin v. Barnhart*, 365 F.3d 1208, 1215 (10th Cir. 2004) [internal citation omitted], *citing Goatcher v. United States Department of Health & Human Services*, 52 F.3d 288, 290 (10th Cir. 1995). The pertinent factors are: (i) the length of treatment relationship and frequency of examination; (ii) nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (iii) the degree to which the physician's opinion is supported by relevant evidence; (iv) consistency between the opinion and the record as a whole;

(v) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (vi) other factors brought to the ALJ's attention which tend to support or contradict the opinion. *Watkins v. Barnhart*, 350 F.3d 1297, 1300-01 (10th Cir. 2003), *citing Drapeau v. Massanari*, 255 F.3d 1211, 1213 (10th Cir. 2001). Here, the ALJ succinctly summarized Dr. Palacio-Holman's conclusions and rejected them because they were inconsistent with the body of her report, but did not specify any inconsistencies or note any of her findings on exam, nor did he mention, much less connect the evidence in the record, to any of the other pertinent factors. The Commissioner argues that Dr. Palacio-Holman's findings that the claimant had average intelligence; some ability for abstract thought; intact attention, concentration, and memory; good judgment, insight, and impulse control; and her recommendation that the claimant be evaluated for vocational rehabilitation support the ALJ's determination that her opinions were "wholly" inconsistent with her report. Additionally, the Commissioner argues that Dr. Palacio-Holman's opinions are inconsistent with other substantial evidence in the record including Dr. Hoffman's July 2011 examination and opinions. However, the ALJ offered no such explanation for declining to impose any of Dr. Palacio-Holman's restrictions when forming the claimant's RFC. *See, e.g., Haga v. Astrue,* 482 F.3d 1205, 1207–08 (10th Cir. 2007) ("[T]his court may not create or adopt post hoc rationalizations to support the ALJ's decision that are not apparent from the ALJ's decision itself.").

The claimant also argues, and the Court agrees that the ALJ did not properly address his peripheral neuropathy when forming his RFC. In his written opinion, the ALJ determined that the claimant's peripheral neuropathy was a severe impairment at step

two, but neglected to include any limitations corresponding to this impairment in the claimant's RFC at step four or explain why no such limitations were needed (Tr. 27-32). Indeed, most of the analysis at step four was devoted to discrediting the claimant's complaints and essentially calling into question the findings of severity at step two. What the ALJ should have done instead was provide an explanation as to how an impairment found to be severe at step two became so insignificant as to require no corresponding limitations in the RFC at step four. *See, e. g., Timmons v. Barnhart*, 118 Fed. Appx. 349, 353 (10th Cir. 2004) (finding the ALJ should have "explained how a 'severe' impairment at step two became 'insignificant' at step five."); *see also Hamby v. Astrue*, 260 Fed. Appx. 108, 112 (10th Cir. 2008) ("In deciding Ms. Hamby's case, the ALJ concluded that she had many severe impairments at step two. He failed to consider the consequences of these impairments, however, in determining that Ms. Hamby had the RFC to perform a wide range of sedentary work.").

Because the ALJ failed to properly evaluate the medical evidence, and further failed to explain how the claimant's severe impairment of peripheral neuropathy determined at step two became so insignificant as to require no limitations in his RFC at step four, the decision of the Commissioner must be reversed and the case remanded to the ALJ for further analysis. If such analysis results in any adjustment to the claimant's RFC, the ALJ should then re-determine what work, if any, the claimant can perform and ultimately whether he is disabled.

## Conclusion

In summary, the Court finds that correct legal standards were not applied by the ALJ, and the Commissioner's decision is therefore not supported by substantial evidence. Accordingly, the decision of the Commissioner is hereby REVERSED, and the case is REMANDED for further proceedings consistent with this Opinion and Order.

**DATED** this 17th day of March, 2017.

_____
**STEVEN P. SHREDER
UNITED STATES MAGISTRATE JUDGE**